## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MARINE POWER HOLDING, L.L.C.**                    CIVIL ACTION

**VERSUS**                                                    No. 14-912

**MALIBU BOATS, LLC**                                       SECTION I

### ORDER AND REASONS

Before the Court are Malibu's motions[1] for judgment as a matter of law and a new trial. For the following reasons, the motion for judgment as a matter of law is granted in part and denied in part, and the motion for a new trial is denied.

### I.

Marine Power manufactures boat engines, and Malibu manufactures ski and wakeboard boats. Marine Power was, at one point, one of Malibu's engine suppliers. This matter arises out of the collapse of their commercial relationship. Much about the scope and breadth of the relationship as well as who is to blame for the collapse of the relationship remains disputed amongst the parties. Nonetheless, all parties agree that on April 15, 2014, Malibu sent a letter to Marine Power terminating a purchase order that Malibu had previously issued to Marine Power. The purchase order requested a number of boat engines from Marine Power for Malibu's ski and wakeboard boats.

After Malibu terminated the purchase order, Marine Power sued. The jury returned a verdict in favor of Marine Power for $3.1 million. That award was split into two main components. First, $1.8 million in foreseeable losses for Marine

---

[1] R. Doc. No. 319; R. Doc. No. 320.

Power's lost revenue, obsolete parts, and miscellaneous costs due to the termination of the purchase order.  Second, an additional $1.3 million in unforeseeable lost profits awarded pursuant to Louisiana Civil Code article 1997 because the jury determined that Malibu breached the contract in bad faith.  Malibu now moves both for judgment as a matter of law and for a new trial.

## II.

### A.

The parties agree on the standard of review with respect to the motion for judgment as a matter of law.[2]  A motion for judgment as a matter of law should only be granted "if the facts and inferences point so strongly in favor of one party that reasonable minds could not disagree."  *Gomez v. St. Jude Med. Diag Div. Inc.*, 442 F.3d 919, 927 (5th Cir. 2006).

### B.

The parties disagree on the standard of review with respect to the Rule 59 motion for a new trial.  Fifth Circuit law controls this Court's disposition of the issue. Malibu's Rule 59 motion with regards to the sufficiency of the evidence on damages and liability is governed by state law.  *See, e.g.*, *Brown v. Wal-Mart La., L.L.C.*, 565 F. App'x 293, 295 (5th Cir. 2014) ("*Gasperini* requires this Court to apply Louisiana law to . . . new trial motions when exercising diversity jurisdiction.").[3]  Meanwhile,

---

[2] *See* R. Doc. No. 319-1, at 1 n.1; R. Doc. No. 326, at 3-4.
[3] The Court notes some concern that the view that state law governs all motions for a new trial based on the adequacy of the evidence to support a jury verdict is not compelled by *Gasperini*, which engaged in a more nuanced analysis as to the specific New York statute at issue before determining that state law governed.  *See, e.g.*, *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 429 (1996) (observing "the

"the propriety of opening and closing arguments is a matter of federal trial procedure." *Learmonth v. Sears Roebuck & Co.*, 631 F.3d 724, 731 (5th Cir. 2011). Therefore, Malibu's motion for a new trial based on statements by counsel is "subject to federal rather than state law." *Id.*

Under federal law, this court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Under state law, a new trial is appropriate "[w]hen the verdict or judgment appears clearly contrary to the evidence," La. Code. Civ. P. art. 1972, or "if there is good ground therefore," La. Code Civ. P. art. 1973.

## III.

Malibu requests that this Court eliminate the $1.3 million in unforeseeable damages awarded under Louisiana Civil Code article 1997. The Court agrees that the award of damages under article 1997 was error. The Civil Code only permits the award of damages "that are the direct consequence of [a] failure to perform," La. Civ. Code art. 1997, and Marine Power's claimed losses in a wholly different market related to a different type of boat engine are too attenuated to constitute "direct" damages as a matter of law.

### A.

Before turning to the merits of the Malibu's motion, however, the Court must first address whether Malibu sufficiently raised the issue of the "directness" of Marine Power's damages theories in its Rule 50(a) motions. Because motions under

---

State's objective is manifestly substantive"). However, the issue is one for the Fifth Circuit and not this Court.

Rule 50(b) are considered to be renewals of a Rule 50(a) motion, "[a] motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008).  Accordingly, issues not raised in a Rule 50(a) motion are waived and cannot be argued in a subsequent Rule 50(b) motion. *See, e.g.*, *In re Isbell Records, Inc.*, 774 F.3d 859, 867-69 (5th Cir. 2014).  Marine Power contends that Malibu failed to sufficiently raise the issue of the directness of the damages in a Rule 50(a) motion in order to raise it now as a Rule 50(b) motion.

Malibu at least twice raised the issue of the directness of Marine Power's damages in Rule 50(a) motions.   First, at the close of Marine Power's case, Malibu's counsel argued that "[e]ven though bad faith, [a] contractor can recover no more than the damages which are direct consequences of the breach," R. Doc. No. 311, at 909:16-18, and he then noted that therefore Marine Power could not "recover for bad faith," R. Doc. No. 311, at 910:4-5.  Then, at the close of evidence, counsel for Malibu not only incorporated the arguments raised in the Rule 50(a) motion made at the end of plaintiff's case, R. Doc. No. 313, at 1392:8-11, but he then added additional observations based on the evidence and testimony submitted by Malibu that called into question the directness of Marine Power's damages, R. Doc. No. 313, at 1394:12-1395:1.

Especially when taken together, the Court finds that Malibu's arguments in the Rule 50(a) motions were sufficient to preserve Malibu's arguments that Marine Power's damages in the Pacific Northwest were too remote to be recovered under Louisiana Civil Code article 1997.  Notwithstanding the occasional lack of precision

in Malibu's oral motion, the Court understood Malibu to be making such an argument at the time given Malibu's long discussion of *Cusachs & Co. v. Sewerage & Water Bd. Of New Orleans*, 40 So. 855 (La. 1906), which is perhaps the leading Louisiana case on the directness of damage.  *See* R. Doc. No. 311, 909:6-25.  Therefore, the Court declines to punish Malibu now for not further needlessly belaboring an already understood point in the middle of a busy trial schedule.  *See, e.g.*, *In re Isbell Records, Inc.*, 774 F.3d at 868 (noting main purpose of Rule 50(a) motion is to provide notice to Court and opposing counsel).[4]

## B.

The Louisiana civil law tradition does not treat breach of contract as a strict liability offense.  *See, e.g.*, *Green v. Farmers' Consol. Dairy Co.*, 37 So. 858, 871-72 (La. 1905).   Accordingly, article 1997 of the Louisiana Civil Code provides for enhanced damages when a party breaches a contract with the wrong intent.  Under article 1997, "[a]n obligator in bad faith is liable for all the damages, *foreseeable or not*, that are a *direct* consequence of his failure to perform."  *Compare* La. Civ. Code

---

[4] Marine Power suggests that Malibu not only failed to argue the directness of damages at trial, but also affirmatively disclaimed any such argument by noting that Malibu "do[es]n't have an issue" with Marine Power's claim of damages in the Northwest.  R. Doc. No. 311, at 905, at 2; *see* R. Doc. No. 326, at 17-18.  Marine Power, however, quotes Malibu out of context.  The language Marine Power quotes is Malibu trying to ensure that Marine Power is not claiming any lost profits *outside* of Marine Power's supposed damages in the Pacific Northwest—a point Marine Power confirmed to the Court shortly thereafter.  R. Doc. No. 311, at 905:12-14.

After that colloquy, Malibu then raised its challenge to Marine Power's bad faith damages, R. Doc. No. 311, at 910:5-6—the entirety of which related to Marine Power's lost profits in the Pacific Northwest.   It is simply not an accurate representation of the record for Marine Power to assert that Malibu somehow announced that it was not challenging Marine Power's claimed lost profits in the Northwest.

art. 1996 ("An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made.").

That is not to say that Louisiana requires a party that breaches a contract in bad faith to become the insurer for all misfortunes that may arise from the breach of contract.  Far from it.  Instead of relying on *foreseeability* to limit the liability of a party that breaches a contract in bad faith, Louisiana relies on the *directness* of damages.  So even when a party breaches a contract in bad faith in Louisiana, that party is liable for "the direct and immediate consequences of the breach, but for no more."  *Porter v. Barrow*, 3 La. Ann. 140, 140 (La. 1848).

Enforcing that rule requires courts and juries to distinguish between direct, unforeseeable damages—which are permissible—and indirect, unforeseeable damages—which remain strictly verboten.  That is a tricky task: "the line of distinction between *indirect* damage and *unforeseen* damage is as subtle as it is blurred."  6 La. Civ. L. Treatise, Law of Obligations § 5.27 (2d ed. 2016).  For that reason, the relevant category of direct, unforeseen damages remains quite narrow.

A variety of legal theories have attempted to distinguish between direct and indirect damages.  *See Newport Ltd. v. Sears, Roebuck & Co.*, No. 86-2319, 1995 WL 688799, at *2-3 (E.D. La. 1995).  The main approach borrows from French law and defines "direct" damages as those damages that are a necessary consequence of the breach.  *See, e.g.*, Barry Nicholas, *French Law of Contract* 224 (1982).  Thus, damages become "a remote and indirect consequence" of a bad faith breach of contract when they have "no necessary relation" to the breach.  *Cusachs*, 40 So. at 856.  A particular damage has no necessary relation to a breach "when that damage is the result not

6

only of the other party's fault, but also of an additional cause that introduced itself into the chain of causation."  6 La. Civ. L. Treatise § 5.24.  Under that view, a merchant that knowingly sells a farmer a diseased cow is liable for not only the loss of the diseased cow but also any of the farmer's other cows that are infected by the diseased cow.  But the merchant would not be liable for any resulting loss of the farm due to the inability of the farmer to pay his debts.  *See Cusachs*, 40 So. at 856; *see also* 6 La. Civ. L. Treatise § 5.24.

Given the inherent vagueness in asking whether a particular damage is a "direct" or "necessary" consequence of a breach of contract, the determination of whether a particular damage is direct "is the prerogative of the trier of facts." *Volentine v. Raeford Farms of La.*, 201 So. 3d 325, 349 (La. Ct. App. 2d Cir. 2016). Nonetheless, Louisiana law has also long been clear that there are ultimately limits to that discretion.  *See, e.g., Stewart v. Sowles*, 3 La. Ann. 464, 466 (La. 1848) ("Although the law intends to punish the fraudulent vendor, it has . . . been unwilling to confide to courts or juries an uncontrolled discretion, which might be exercised in a spirit of vengeance, and run into oppression and injustice. Remote damages are, therefore, excluded . . . ."); *see also Womack v. Custom Homes & Renovations*, 820 So. 2d 1196, 1203 (La. Ct. App. 4th Cir. 2002) (reversing trial court on multiple grounds and observing that "no case . . . goes anywhere remotely as far as to hold" that an awarded damage constitutes a direct damage under article 1997).

The Court concludes that Marine Power's bad faith damages theories are too remote as a matter of law.  Therefore, there was no "no legally sufficient evidentiary basis for a reasonable jury to have found," *Foreman v. Babcock & Wilcox Cox.*, 117

F.3d 800, 804 (5th Cir. 1997), that Marine Power's bad faith damages were a "direct and immediate" consequence of Malibu's breach.  Thus, the jury had "no discretion" to award the requested bad faith damages, *Arrowsmith v. Gordon*, 3 La. Ann. 105, 112 (La. 1848) (on rehearing), and the jury's verdict was either clearly wrong or manifestly erroneous.  A review of Marine Power's two distinct theories as to how Malibu's breach damaged Marine Power's jet boat business in the Pacific Northwest demonstrates why any such damages, which theoretically are designed to compensate Marine Power for losses through 2020, are too remote to be awarded under article 1997.

## 1.

The first damages theory turns on the effect that Malibu's breach had on Marine Power's cash flow and the corresponding effect that the loss of that cash flow had on Marine Power's business in the jet boat market in the Pacific Northwest. Marine Power's witnesses suggested that Malibu's decision to breach the purchase agreement interrupted Marine Power's cash flow.  As one of Marine Power's witnesses testified, at the time Malibu breached the parties' agreement, Marine Power was "expecting" to obtain roughly "$5.9 million" in cash flow based on Marine Power's performance of the contract.  R. Doc. No. 304, at 187:16-17.  That cash flow, the witness suggested, "was going to be used to invest more personnel and more engineering and more capital up in [the Northwest market]."  R. Doc. No. 304, at 187:16-18.

Marine Power implies that, as a result of the breach and its depleted cash flow, Marine Power was forced to divert its attention to its ski/wakeboard boat engine

business, meaning that its remaining personnel became unable to devote sufficient time, effort, and money to the Northwest jet boat division. *See, e.g.*, R. Doc. No. 306, at 742:23-743:2 (noting breach necessitated layoffs); R. Doc. No. 306, at 706:12-14 (Marine Power's damages expert testifying that Marine Power's sales in the Northwest were linked to Marine Power's "shrinkage" and "overall company health"). Likewise, Marine Power argues that the interruption in Marine Power's cash flow also resulted in Marine Power's Northwest sales representative—Chris Cardon— defecting to Marine Power's main competitor out of fear that Marine Power was going out of business. *See, e.g.*, R. Doc. No. 306, at 743:3-5.

Neither of those downstream consequences—*i.e.*, the lost sales in the Pacific Northwest jet boat market through 2020 or the loss of Chris Cardon—due to the interruption in Marine Power's cash flow caused by Malibu's breach of the parties' contract qualify as a "direct consequence" under article 1997.

This case is distinguishable from the cases in which Louisiana courts have permitted recovery for harms traceable to an interruption in cash flow. Those cases generally involve situations where the breach of contract relating to the plaintiff's use of a particular property directly impacts a plaintiffs' ability to make payments to the bank resulting in a forced sale of *that* property. *See, e.g.*, *Volentine*, 201 So. 3d at 349 (bad faith breach of contract to provide chickens to chicken farmer directly resulted in forced sale of chicken farm due to indebtedness); *Hollenbach v. Holden*, 728 So. 2d 544, 550 (La. Ct. App. 3d Cir. 1999) (bad faith breach of contract to clean up oil spill on property directly resulted in loss of property as plaintiffs were unable to afford required clean-up costs). And even the *Volentine* court recognized that the

damages awarded there were "not the most direct damage[s]," 201 So. 3d at 349, seemingly suggesting that any such damages represented the outer limits of what was permissible.

By contrast, here the loss of cash flow in one part of Marine Power's business (ski/wakeboard engines) is alleged to have consequential effects over a multiple-year period in a *separate* division of Marine Power's business (jet boat engines). As such, the facts are far closer to the facts considered by the Louisiana Supreme Court in *Cusachs*. In that case, Cusachs & Co. tried to claim that the loss of a quarrying business in New York was a direct consequence of the New Orleans Sewerage & Water Board's breach of a contract with Cusachs & Co. because the breach left Cusachs & Co. unable to pay its bills. *See* 40 So. at 855. The Louisiana Supreme Court rejected that claim: the court acknowledged "[i]t is sometimes difficult to determine whether a certain result is or not a direct and immediate consequence," but then went on to note that it had no "such difficulty . . . in the present case." *Id.* at 856. The damages from the loss of the quarrying business had "no necessary relation" to the breach of contract, beyond, of course, making it more difficult for Cusachs & Co. to pay its bills. *Id.* Therefore, the loss could not qualify as a direct consequence of the breach. *See id.*

The same is true here. Just as the *Cusachs* court concluded that the spillover effect to other portions of Cusachs and Co.'s business were too indirect for the purposes of article 1997, this Court concludes that any spillover effect from Marine Power's lost cash flow and corresponding lost opportunity to further invest in Marine Power's Northwest division's jet boat business and the yet further supposed

downstream effect of lessened sales due to the lessened investment has no necessary connection to Malibu's breach (as any number of factors can cause a decline in sales over a lengthy period).[5]

Moreover, the number of intervening factors also serves to distinguish this case from the lost-cash-flow harms recognized in *Volentine* and *Hollenbach*. In both *Volentine* and *Hollenback*, the plaintiff was, in essence, trying to link the lost cash flow to a single downstream transaction (*i.e.*, a forced sale of property) that harmed the plaintiff. Here, Marine Power is attempting to connect the breach to innumerable separate downstream transactions. The multitude of additional transactions that the damages theory relies upon also demonstrate why the claimed downstream harms cannot be "direct" damages: Marine Power's post-breach inability to enter into "separate and independent agreement[s]" to sell Marine Power jet boat engines to independent jet boat manufacturers "cannot be attributable with any degree of certainty to the breach or whether they are connected to other causes." *Spencer v. Luckenbach Gulf S.S. Co.*, 197 La. 652, 659 (1941). Thus, the "conjectural factor" of the jet boat manufacturers' "willingness or unwillingness to enter into a contract with" Marine Power "is another cause[,] the intervention of which suffices to turn the alleged damages into an indirect, or remote, consequence of [Malibu]'s failure to perform." 6 La. Civ. L. Treatise § 5.26.[6]

---

[5] *See, e.g.*, R. Doc. No. 306, at 226-27 (former Marine Power salesperson now working for Marine Power competitor testifying that the Northwest jet boat market was "depressed" and sales across the market "are at an all-time low, lower than [manufacturers] have seen in 30 years").

[6] To borrow the oft-used example of the sale of the diseased cow, Marine Power's first damages theory would be akin to a farmer who was sold a diseased cow attempting to claim losses related to his side cashmere wool business on the theory that he had

Marine Power's cash flow damages theory does not improve when Marine Power attempts to connect its lost-cash-flow damages to the departure of salesman Chris Cardon.   In the first place, the Court has doubts that downstream harms attributable to an employee's decision to leave a company could ever be directly caused by the breach of a commercial contract.  *Cf. Duodesk v. Gee Hoo Indus. Corp.*, No. 14-1363, 2016 WL 354851, at *6 (E.D. La. 2016) (noting that loss of an employee's time "was not a 'direct consequence'" of breach for purposes of article 1997).[7]  But even if that obstacle could be overcome, there would still be the fundamental problem that Marine Power's damages theory is based on the idea that the breach resulted in a decrease in cash flow that resulted in a Marine Power employee making the decision to leave Marine Power which made it more difficult for Marine Power to persuade jet boat manufacturers *over a five year period* to make the decision to purchase Marine Power jet boat engines.

---

to spend so much time trying to nurse his cow herd back to health and work on his un-grazed fields that he had less time to tend to his cashmere goats which resulted in the production of less-desirable cashmere which meant that independent buyers were less likely to buy his cashmere.  Such consequences would be "a remote and indirect consequence of the fraud" related to the sale of the diseased cow, and would "not form a sufficient basis for a claim of damages from the seller of the cow." *Cusachs*, 40 So. 856.

[7] The Court also notes some doubt as to whether the record reflects that Mr. Cardon left because of Malibu's breach.  Though a Marine Power witness suggested that Mr. Cardon left because of the breach (R. Doc. No. 306, at 743:3-5) and Malibu did not raise a hearsay objection the suggestion (R. Doc. No. 306, at 741:25-743:8), Mr. Cardon himself testified that he left Marine Power for reasons related to "reliability and supply" that were unconnected to Malibu. *See, e.g.*, R. Doc. No. 306, at 215-16, 225-26.  Nonetheless, in light of the Court's other determinations, it need not resolve the issue to conclude that Marine Power's damages are too indirect as a matter of law.

Even when Chris Cardon is substituted into the chain of causation in place of the more amorphous harm to Marine Power's "time/money,"[8]  that substitution still does not address the fundamental defect in Marine Power's damages theory: the "conjectural factor" of the jet boat manufacturers' "willingness or unwillingness to enter into a contract with" Marine Power.   6 La. Civ. L. Treatise § 5.26.   That conjecture "turn[s] the alleged damages into an indirect, or remote, consequence of the [Malibu]'s failure to perform."  6 La. Civ. L. Treatise § 5.26; *see also Spencer*, 197 La. at 659.

**2.**

Marine Power's second damages theory—that the breach forced Marine Power to convert the engines Marine Power built for Malibu into jet boat engines, a task for which the Marine Power engines were inherently ill-suited, which in turn meant Marine Power was selling defective jet boat engines, which then lead to a decrease in Marine Power's business reputation in the jet boat market, which then resulted in lost jet boat sales through 2020—is no more direct than Marine Power's lost cash flow/Chris Cardon theory of damages.  Indeed, merely explaining all the links in Marine Power's causality chain would seem to demonstrate that the damages were not direct.

According to Marine Power, "we tried to bring some" of the engines built for Malibu before Malibu breached the contract "back to our production line and basically unbuild them and rebuild them and convert them for use in other markets."  R. Doc. No. 305, at 489:8-10.  Unfortunately, however, "they were engines designed for ski

---

[8] R. Doc. No. 326, at 20.

boats and not for aluminum boats." R. Doc. No. 304, at 187:3-5. That meant the engines were poorly suited for conversion to jet boats: "These motors were made to work and start and run in a Malibu boat with a Malibu dashboard with a Malibu key, and putting them in another company's boats caused problems. They don't have the right programming to even start the engine, much less run correctly. And there are multiple items like that . . . ." R. Doc. No. 305, at 490:10-15. Because Marine Power's engines were defective, "[o]ur customers didn't like -- they were not happy with those engines." R. Doc. No. 305, at 489:16-18. As such, "the engines were poorly received" and the consequences of that poor reception had effects "on the Northwest, you know, market." R. Doc. No. 306, at 689:24.

Marine Power argues that the resulting ill-will from the engines that did not run correctly "lost substantial customers" for Marine Power's other jet boat engines. R. Doc. No. 305, at 491:1. The Court sees multiple legal defects with Marine Power's claim of a showing of direct causation. Malibu's breach was not a direct cause of those losses—if anything, the cause was Marine Power's decision to sell defective engines that did not run correctly in the Northwest jet boat market. *See, e.g.*, *Womack*, 820 So. 2d at 1203 (breach of contract to repair home not direct cause of second contractor's negligence). *But see Gross v. RSJ Int'l, LLC*, 2012 WL 729955 (E.D. La. 2012) (breach of contract to repair home is direct cause of replacement contractor's use of toxic Chinese drywall). As the "true and direct and immediate cause of the loss of the business was the action" of Marine Power, *Cusachs*, 40 So. at 856, Malibu's breach had "no necessary relation" to Marine Power's losses in the Northwest, *id.*, and it was not the direct cause of those losses for the purposes of article 1997.

14

Further, even if Marine Power's sale of defective engines is seen as a direct consequence of Malibu's breach via the duty to mitigate—an argument that seems tenuous insofar as a party is supposed to exercise *reasonable care* when mitigating[9] and Marine Power's we-couldn't-get-the-programming-right-but-still-tried-to-sell-them-anyway approach would seem to be the antithesis of that—Marine Power still has the problem that the ultimate damage Marine Power is claiming is not, for example, the costs associated with accepting a return of the defective engines. Rather, Marine Power is attempting to collect on the yet further downstream harms on future sales to jet boat manufacturers based on those manufacturers' independent perception of Marine Power's jet boat engines.   As such, Marine Power's we-were-forced-to-sell-defective-engines damages theory still inevitably founders on the same ground that its lost-cash-flow/Chris Cardon theory does: those jet boat manufacturers' independent perceptions of Marine Power constitute an intervening cause of Marine Power's losses, and therefore those losses remain indirect.  *See, e.g.*, 6 La. Civ. L. Treatise § 5.26; *Spencer*, 197 La. at 659.

*        *        *

Accordingly, the Court concludes that—even if all Marine Power's factual submissions are fully accepted—there are simply too many intervening causes for Marine Power to show that its lost sales through 2020 in the Pacific Northwest jet boat market were either a "direct" or "necessary" consequence of the interruption in Marine Power's cash flow due to Malibu's breach of contract.  Therefore, Malibu is entitled to judgment as a matter of law and Marine Power is not entitled to bad faith

---

[9] *See, e.g.*, *Unverzagt v. Young Builders, Inc.*, 215 So. 2d 823, 825-26 (La. 1968).

15

damages because there is no legally sufficient evidentiary basis for a reasonable jury to conclude that any of Marine Power's damages theories were sufficiently "direct" to be compensable under article 1997. This Court will therefore eliminate the jury's award of $1.3 million in bad faith damages.[10]

## IV.

Malibu argues that it is entitled to a new trial because of comments made by Marine Power's counsel during the trial. When considering whether conduct by counsel resulted in the denial of a fair trial, this Court examines the entire argument made by counsel "within the context of the court's rulings on objections, the jury charge, and any corrective measures." *Learmonth*, 631 F.3d at 731 (internal quotation marks omitted). "Alleged improprieties may well be cured by an admonition or charge to the jury." *Id.* "A motion for new trial premised on improper arguments by counsel should only be granted when improper . . . argument irreparably prejudices a jury verdict or if a jury fails to follow instructions." *Baisden v. I'm Ready Productions, Inc.*¸ 693 F.3d 491, 509 (5th Cir. 2012).

## A.

The great Louisiana flood of 2016 happened after the close of evidence, but before closing arguments and jury deliberations. The economic costs of the flood were immense; the human costs all the more so.

---

[10] Because the Court concludes that Marine Power's bad faith damages theories are too indirect to be awarded under article 1997, it does not address Malibu's other challenges to the award of bad faith damages.

Despite undoubtedly knowing better, counsel for Marine Power made the unfortunate and ill-advised choice to begin his closing argument by discussing the impact of the flooding on the plaintiff.

> So last week we had a long week of trial followed by a lot of rain. I was thinking about y'all. I hope you weren't personally impacted, but I suspected some of you were or know people who were. I know Mr. Allbright, his home was flooded. Marine Power took on water. So, you know, we're very sympathetic about all those issues and thank you very much for making it a priority to be back here today. We really, really appreciate that.

R. Doc. No. 313, at 1413:13-20.  Those comments happened at the beginning of Marine Power's closing argument.  Nonetheless, despite multiple potential opportunities to raise the issue without interrupting Marine Power—such as before and after Malibu's closing arguments—Malibu waited until *after* Marine Power's rebuttal to raise the issue with the Court.  R. Doc. No. 313, at 1479:16-1480:5.  And even then Malibu only requested "a curative instruction" on the issue from the Court.  R. Doc. No 313, at 1479.

The Court, after noting that Malibu had waived the argument by failing to timely raise the issue (*see* R. Doc. No. 313, at 1480:11), nonetheless provided the requested curative instruction.

> [T]here was some reference in argument to flooding and the disaster that happened in Louisiana. Obviously that should have no place in your deliberations, although we certainly sympathize with all those that suffered a loss and had to deal with that. Especially in New Orleans, we can sympathize with that having gone through Katrina. We're sorry for that, but that has no place and you should give that no weight in making a determination in this case.

R. Doc. No. 313, at 1486:14-21.  The jury then acknowledged the limiting instruction. *See* R. Doc. No. 313, at 1487:18.

Given that Malibu not only waived its objection by failing to timely object, but then also got everything it requested from the Court, Malibu's present request for a new trial is not well taken. The Court will not grant a new trial based on a waived argument for which no prejudice can be shown.

The Court has no doubt that the jury understood the limiting instruction, and sees no reason to discard the presumption that "[t]he jury is presumed to follow the instructions of the Court." *Jordan v. Ensco Offshore Co.*, No. 15-1226, 2016 WL 4010986, at *5 (E.D. La. 2016). Moreover, given the relative simplicity of the case as well as the fact that each side's trial presentation covered the relevant documents *ad nauseam*, the time the jury deliberated hardly demonstrates the existence of any unfair prejudice. *Cf. Marx v. Hartford Accident & Indem. Co.*, 321 F.3d 70, 71 (5th Cir. 1963) ("We cannot hold an hour-glass over a jury.").[11] Finally, Malibu's failure to move for a mistrial also "suggests that any lingering prejudice from the improper comments was minimal." *Learmonth*, 631 F.3d at 733 (internal quotation marks omitted).[12]

---

[11] The Court also notes that the legally impermissible award of bad faith damages should not be taken as a sign of any unfair prejudice by the jury. Not only does the record contain evidence that supported the idea of unfair business practices by Malibu, *see, e.g.*, R. Doc. No. 304, at 139:14-140:1, but also Malibu did not focus its trial presentation on the directness of the damages. Instead, it mainly argued that there was no bad faith breach because of pricing differences between Marine Power and its competitors. *See, e.g.*, R. Doc. 313, at 1467:7-1470:2. As a practical matter, Malibu left itself little room for error in front of the jury if the jury did not believe Malibu's we-got-a-worse-deal-from-Indmar argument and did not find Mr. Cardon—who now works for Indmar (Marine Power's competitor)—credible.

[12] Malibu argues that Marine Power's request that the jury "Think about Eddie [Albright]" when determining damages, R. Doc. No. 313, at 1477:19, constituted an impermissible "Golden Rule" argument. The Court rejects the suggestion—Marine Power did not request that the jury put itself in the place of Marine Power. However, even if the argument was improper, any prejudice arising from those comments was

## B.

Malibu also suggests that it is entitled to new trial because Marine Power's counsel improperly suggested that Marine Power was forced to obtain a court order to require Malibu to produce documents relating to their negotiations with Indmar Marine (another boat engine manufacturer).  In particular, Marine Power's counsel told the jury that "I am hoping that you look at" documents relating to Indmar "[b]ecause if you look at them, you will see the documents that they didn't want to give us, that we had to get a court order to get after the deposition testimony was taken, are all there."  R. Doc. No. 313, at 1470:18-21; *see also* R. Doc. No. 313, at 1431:23-1432:32.

Malibu fails to justify a new trial.  First, Malibu failed to object at the time the comments were made.[13]  Second, the Court provided an on-point limiting instruction:

---

cured by the Court's instructions that sympathy should play no role in the jury's verdict, R. Doc. No. 313, at 1486:16-21, 14, 1488:25-1489:2, as well as the instruction that all parties are "equals before this Court," R. Doc. No. 313, 1487:8.  *See, e.g.*, *Learmonth*, 631 F.3d at 732 (noting jury instructions cured any unfair prejudice from conscience-of-the-community argument).

[13] The Court acknowledges Malibu's argument that Malibu did not want to interrupt Marine Power's closing argument or focus the jury on a particular point.  Such tactics may well be justified if opposing counsel is making comments that only need to be addressed with a limiting instruction after a closing argument (provided, of course, that counsel immediately brings the issue to the Court's attention after the other side finishes speaking).  Nonetheless, if opposing counsel is making mistrial-worthy comments that fundamentally call into question the fairness of the proceedings the situation is different.

After all, comments justify a mistrial rather some other sort of correction precisely because they are the type of comments that catch and hold the jury's attention regardless of whether counsel objects.  Accordingly, when those types of comments are being made, counsel is better advised to object contemporaneously so as to enable the Court to immediately intervene to halt any such comments, castigate opposing counsel, and issue a strong corrective instruction before any further prejudice occurs.  Moreover, to the extent that a party is worried about calling the jury's attention to a particular objection, the Court may consider any lingering

[T]here was a reference that the plaintiff had to get the Court to order some Indmar documents for the plaintiff to obtain them, or something to that effect. You-all remember what the argument is. I can't remember it exactly, to be honest with you.

Obviously the circumstances under which the Indmar documents were produced, to the extent they were produced, are of no concern to your deliberations and you should not consider that fact.

R. Doc. No. 313, at 1486:22-1487:5.[14]  As such, again, the Court sees no reason to grant a new trial as the Court sees no indication that the jury disregarded the Court's limiting instruction or that there was any lingering prejudice, particularly as Malibu did not move for a mistral at the time.[15]

## C.

Next, Malibu argues a new trial is warranted because Marine Power's counsel supposedly misrepresented the evidentiary record in Marine Power's closing statements.  Malibu suggests that Marine Power's counsel did this in two ways: first, by misrepresenting that evidence in the record suggests that Chris Cardon left Marine Power because of Malibu's breach, and second, by making it look as if Malibu was trying to hide Ritchie Anderson (a Malibu employee) from testifying even though

---

prejudice from that fact when considering whether a corrective instruction or a mistrial is necessary after a timely raised objection.

[14] The Court also instructed the jury not to penalize a party for its lawyer's objections. *See* R. Doc. No. 313, at 1491:10-16.

[15] In the alternative, Marine Power used the Indmar documents at issue to demonstrate that Malibu breached the contract in bad faith because it had obtained a better price from Indmar on the engine.  R. Doc. No. 313, at 1470:22 ("[Y]ou'll see the price differential.").  Therefore, given that this order also grants Malibu's motion for judgment as a matter of law on the issue of bad faith damages, there would be insufficient lingering prejudice to Malibu from counsel's comments to justify a new trial.  Even if the jury disregarded the Court's instruction—which, again, the Court sees no evidence of—the lingering harm would be minimal because the jury's determination of bad faith would not result in any increased damages.

he sat for a deposition and Marine Power did not attempt to procure his testimony at trial.

The Court declines to grant a new trial on those grounds.  First, as the Court noted at the time, Malibu waived its objections by failing to raise them on a timely basis.[16]  Second, Malibu did not request a mistrial.  Third, there was at least some evidentiary basis—though not necessarily a substantial one—for suggesting that Mr. Cardon left Marine Power on account of Malibu.  *See supra* n.7.  Fourth, the Court provided instructions[17] to the jury that the comments made by counsel were not evidence and that it must decide the case based on the evidence.  Therefore, Malibu does not convince the Court that a retrial is necessary.[18]

### D.

Malibu's next justification for a new trial is based on Marine Power's comments that certain Malibu witnesses were coached by counsel.  The Court declines to order

---

[16] Indeed, even when Malibu raised its tardy objection to Marine Power's discussion of Ritchie Anderson, Malibu raised a different issue than raised here.  *See* R. Doc. No. 313, at 1480:24-1481:2.

[17] "The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence. The statements of counsel are not evidence, they are only arguments. It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest. What the lawyers say or do is not evidence. You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports the arguments. You must determine the facts from all the testimony that you've heard and the other evidence submitted. You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you." R. Doc. 313 at 1488:11-16.

[18] In addition, though not necessary to the Court's determination, as with the Indmar documents, Malibu cannot show prejudice on this issue. Marine Power's discussion of Mr. Cardon and Mr. Anderson relates to Marine Power's bad faith damages theory. As Marine Power cannot collect those damages as a matter of law, Malibu will not be unfairly prejudiced by the comments.

a new trial on that ground.  The Court repeatedly instructed the jury that they should not take account of such comments, *see* R. Doc. No. 313, at 1480:22-23; *see, e.g.*, R. Doc. No. 311, at 958:14-18; R. Doc. No. 306, at 836:22-837:5, and there is no evidence that the jury did not follow the Court's instructions.  Finally, the Court notes that Malibu's failure to move for a mistrial at the time also buttresses the Court's conclusion that any prejudice was not sufficiently severe so as to warrant a new trial. *See Learmonth*, 631 F.3d at 733.

## E.

Malibu also moves for a new trial on the basis of multiple comments by Marine Power's counsel relating to Malibu's status as a large, out-of-state company.

The Court addressed this issue at trial with a curative instruction:

> And finally, obviously all persons before this Court whether corporations, individuals -- and you'll hear a charge to this extent -- come as equals before this Court. It makes no difference whether they are New York companies, Tennessee companies, or Louisiana companies. That is totally irrelevant.
> Nobody made any argument maliciously or in bad faith, but obviously that does not, again, enter into your deliberations as far as where someone comes from and where the lawyers are from. We don't care about that. We care about the evidence and applying the evidence to the law as I give it to you. And that's it.
> Y'all can accept that?
> THE JURORS: (Nod heads.)

R. Doc. No. 313, at 1487:6-16.  The Court also addressed this issue again in the jury instructions: "Do not let bias, prejudice, or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equal in a court of justice." R. Doc. No. 313, at 1490:11-14.  Given the curative instructions, jury instructions, and Malibu's failure to move for a mistrial

during the proceedings, the Court concludes that the risk of any unfair prejudice arising from the comments does not warrant relief.[19]

\*       \*       \*

None of the Marine Power comments raised by Malibu, whether considered individually or together, or whether considered under the "substantial justice" standard for waived objections or under the lower standard for preserved objections, justify a new trial.  To the extent that Marine Power stepped over the line—which counsel certainly did in a few instances—this Court provided admonitions and jury charges to address Marine Power's comments.  Further, having observed the jury when issuing the charges and admonitions, the Court has no doubt that the charges and admonitions were understood and sufficient to combat any lingering unfair prejudice.  This is, after all, a rather mundane—some may even say dull—dispute about a purchase order for motorboat engines, and it is not "a fertile ground for the bias associated with passion or prejudice."  *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 431-33 (5th Cir. 2003) (internal quotation marks omitted).  Accordingly, Malibu's motion for a new trial will be denied.

## V.

Finally, Malibu raises two last arguments.

---

[19] Malibu also managed to mitigate any prejudice by pointing out to the jury on cross-examination that Marine Power's ownership also owns Donovan Marine—an international marine distributor.  R. Doc. No. 306, at 806:25-807:14.  As such, the jury would not see this dispute as the simplistic David v. Goliath scenario that Malibu's motion presupposes.

- It argues for a new trial on liability issues because the evidence either establishes that (1) Marine Power substantially breached the contract first, or (2) that there was no meeting of the minds with respect to the parties' contract.

- It argues for judgment as a matter of law or, alternatively, a new trial with respect to Marine Power's obsolete parts and miscellaneous costs damages.

Having considered the parties' memoranda and citations to the record, as well as the applicable law, the Court concludes that the jury's determinations are supported by the evidence and the law. Therefore, Malibu's remaining arguments set forth no basis for relief under either Rule 50 or Rule 59.[20]

## VI.

Accordingly,

**IT IS ORDERED** that Malibu's motion for judgment as a matter of law is **GRANTED IN PART**. The judgment will be amended to remove the legally impermissible $1.3 million in bad faith damages. The remainder of Malibu's motion for judgment as a matter of law is **DENIED**.

**IT IS FURTHER ORDERED** that Malibu's motion for a new trial is **DENIED**.

New Orleans, Louisiana, December 15, 2016.

_____
LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE

---

[20] The Court also notes that it would arrive at the same result regardless of whether it applied state or federal law.